THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| PERSONACARE OF WARNER ROBINS, INC., PERSONACARE OF GEORGIA, INC., PERSONACARE OF SHREVEPORT INC., and KINDRED NURSING CENTERS LIMITED PARTNERSHIP, <br><br> Plaintiffs, <br><br> v. <br><br> KATHLEEN SEBELIUS, IN HER OFFICIAL CAPACITY AS SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br> Defendant. | Civil Action No. 5:09-CV-221 |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

In this civil action, Plaintiffs ask the Court to reverse the final decision of the Defendant Secretary of Health and Human Services ("the Secretary") denying Plaintiffs' claim for reimbursement in the amount of $219,292. The case arises under the Social Security Act, 42 U.S.C. § 1395oo(f)(1), which incorporates the Administrative Procedures Act, 5 U.S.C. § 706.

Both parties have filed motions for summary judgment. The underlying facts in the case are largely undisputed. Plaintiffs are four related companies that operated Skilled Nursing Facilities in Georgia, Louisiana, and Florida. Plaintiffs participated in the Medicare program through Medicare provider agreements with the Secretary. In 2005, Plaintiffs sold the four facilities and transferred their Medicare provider agreements to the purchasers. After the change of ownership, Plaintiffs submitted a final cost report seeking payment of $219,292 for certain "bad debts" arising from

1

services rendered to Medicare beneficiaries prior to the transfer. The term "bad debts" refers to unpaid deductibles or coinsurance payments for covered services.

The Secretary, acting through a Fiscal Intermediary, denied the claim. After a series of appeals the Secretary finally affirmed the denial, finding that the purchasers, not Plaintiffs, were entitled to claim the bad debts for reimbursement. The Secretary contends that the bad debts could not be claimed on a cost report until they were officially deemed worthless by the issuance of a remittance notice from the state Medicaid agency, an event that occurred in this case after the change of ownership.

The dispute in this case revolves around questions of law, specifically around the requirements for cost reporting by a Medicare provider in the event of a change of ownership. The administration of the Medicare program is governed primarily by the Medicare regulations promulgated by the Secretary and codified in Title 42 of the Code of Federal Regulations ("the Regulations"). The Regulations are explained and interpreted in a Provider Reimbursement Manual ("the Manual") published by the Secretary.

Upon review of the Regulations and the Manual and the undisputed facts of the case, the Court finds that the decision of the Secretary was consistent with the law, was supported by substantial evidence, and was not arbitrary and capricious. In the absence of a genuine issue of material fact, Defendant is entitled to judgment as a matter of law. Defendant's Motion for Summary Judgment (Doc. 17) is therefore **GRANTED**, and Plaintiffs' Motion for Summary Judgment (Doc. 18) is **DENIED**.

**I.     Factual Background**

    **A.     The Sale of the Facilities**

The four Plaintiffs in this case are subsidiaries of Kindred Healthcare, Inc. ("Kindred"). Prior to 2005, each of the four Plaintiffs operated a Skilled Nursing Facility. PersonaCare of Warner Robins, Inc., operated the Warner Robins Nursing and Rehab Center in Warner Robins, Georgia. PersonaCare of Georgia, Inc., operated Athena Rehab of Clayton, in Lake City, Georgia. PersonaCare of Shreveport, Inc., operated Irving Place Rehabilitation and Nursing Center in Shreveport, Louisiana. Kindred Nursing Centers Limited Partnership operated Chalet Village Health and Rehabilitation Center in Berne, Indiana.

The four facilities participated as providers of services in the federal Medicare program and in joint state-federal Medicaid programs. The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the federal Department of Health and Human Services. To become eligible to participate in the Medicare program and receive payment for services provided to Medicare beneficiaries, each facility was required to enter into a provider agreement with the Secretary of Health and Human Services. Each facility had its own separate provider agreement on file with the Secretary.

In 2005, Plaintiffs sold the four facilities to new owners. The change of ownership[1] for the Warner Robins facility became effective on November 30, 2005. The change of ownership for the Clayton facility became effective on December 31, 2005. The change of ownership for the Shreveport facility became effective on July 31, 2005. The change of ownership for the Indiana

---

[1] The parties frequently refer to a change of ownership as a "CHOW." Because the profusion of acronyms in an administrative procedures case can often become confusing, this order tries to avoid them whenever possible.

3

facility became effective on December 31, 2005. With each change of ownership, the facility's provider agreement was automatically assigned to the new owner pursuant to the Medicare regulations, at 42 U.S.C. § 489.18(c).

### B. The Bad Debts

After transferring their interest in the facilities to the purchasers, Plaintiffs filed "Terminating Cost Reports" with the Secretary. The Regulations refer to such reports as "final cost reports." Ordinarily, a Medicare provider must file an annual cost report to support its claims for payment for services rendered to Medicare beneficiaries. When there is a change of ownership, however, the provider files a "final cost report" for the period from the end of the last cost reporting period until the effective date of the change of ownership. See 42 C.F.R. § 413.24(f)(1). In their Terminating Cost Reports, Plaintiffs sought adjustments for "bad debt" costs, in the aggregate amount of $219,292.

"Bad debts" are defined in the Regulations as "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services." 42 C.F.R. § 413.89(b)(1). To be compensable, such bad debts "must be related to covered services and derived from deductible and coinsurance amounts." 42 C.F.R. § 413.89(e)(1). In other words, bad debts are deductibles or coinsurance amounts that Medicare beneficiaries owed but failed to pay to the provider.

The bad debts that Plaintiffs listed in their Terminating Cost Reports were related to services provided to Medicare beneficiaries before the change of ownership. The beneficiaries in question were dual-eligible beneficiaries, eligible for benefits under both Medicare and Medicaid. The debts for such dual-eligible beneficiaries could not be finally deemed worthless until the state Medicaid agencies issued remittance notices confirming that Medicaid would not pay the outstanding

4

deductibles or coinsurance payments. Plaintiffs received these remittance notices after the change of ownership but before filing their Terminating Cost Reports.

### C. The Administrative Procedures

Plaintiffs' Terminating Cost Reports were referred to a Fiscal Intermediary ("FI"), a private insurance company acting as the agent of the Secretary for the purpose of processing reimbursement requests. Between October 2006 and May 2007, the FI issued a Notice of Program Reimbursement to each of the four Plaintiffs. The FI disallowed claims for the bad debts, on the basis that the bad debts could not be claimed for the fiscal periods covered by the Terminating Cost Reports. Pursuant to the Regulations, bad debts can only be claimed at the time they are deemed to be worthless. 42 C.F.R. § 413.89(f).

Plaintiffs appealed the FI's decision to a Providers' Reimbursement Review Board ("Review Board"). The Review Board reversed the decision of the FI and found that Plaintiffs were entitled to claim the bad debts in their Terminating Cost Reports. The Review Board reasoned that Section 2176 of the Manual creates an exception in the case of a change of ownership and allows the terminating owner to obtain reimbursement for bad debts arising from services rendered prior to the change.

The FI in turn submitted the Review Board's decision to the Administrator of CMS for final review. The Administrator reversed the decision of the Review Board and held that the bad debts could not be included on the Terminating Cost Report because they were not deemed worthless during the fiscal period covered by the Report. The Administrator's decision was the final decision of the Secretary. Having no further administrative appeals, Plaintiffs filed the present lawsuit, seeking to reverse the final decision of the Secretary under the Administrative Procedures Act.

## II. Standard of Review - The Administrative Procedures Act

The Secretary's final decision to deny Plaintiffs' request for reimbursement of bad debts is subject to review under the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("the Act"). See Mt. Sinai Hosp. Med. Ctr. v. Shalala, 196 F.3d 703, 707-08 (7th Cir. 1999). The Act authorizes a person adversely affected or aggrieved by the action of a federal agency to seek judicial review of the agency action in a federal district court. 5 U.S.C. § 701. In defining the scope of judicial review, the Act provides that the reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] unsupported by substantial evidence." 5 U.S.C. § 706.

When a dispute involves competing interpretations of agency regulations, the reviewing court "must give substantial deference to an agency's interpretation of its own regulations." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). The court "must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" Id. at 512 (quoting Gardebring v. Jenkins, 484 U.S. 415, 430 (1988)). "This broad deference is all the more warranted when . . . the regulation concerns 'a complex and highly technical regulatory program.'" Id. (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1994)). The Medicare system is as complex and highly technical a regulatory program as ever Congress and the federal bureaucracies have devised, a system outlined, expanded, developed, and explained in a vast library of statutes, regulations, and policies.

## III. The Secretary's Decision

The Secretary's final decision in this case, based upon a record of evidence that is essentially undisputed, was fully consistent with the Regulations that govern Medicare reimbursement and

cannot be deemed arbitrary and capricious or contrary to law. The opinion of the Administrator offers a concise summary of the reason for the final decision:

> The Administrator finds that providers are required to bill the State and receive remittance advices before dually eligible beneficiaries' bad debts can be deemed worthless and written off. Further, the regulation and manual [are] unambiguous that the amounts uncollectible from specific beneficiaries are to be charged off as bad debts in the accounting period in which the accounts are deemed to be worthless. This provision is applicable when there is a change of ownership and the provider accepts automatic assignment of the agreement. In this case, the bad debts at issue cannot be determined to be worthless until the Medicaid remittance advices are received by the Providers. The Medicaid remittance advices for these bad debts were not received by the Providers until after the cost reporting periods at issue. Consequently, under the facts of this case, the bad debts cannot be claimed in the Providers' cost reporting periods ending July 17, 2005, November 30, 2005, and December 31, 2005.

AR 15 (Doc. 14 Vol. 1). The reasoning of the Administrator offers a coherent explanation of the Regulations and procedures for claiming bad debt, and illustrates the sort of bureaucratic expertise that is worthy of deference in an Administrative Procedures case.

The Administrator's summary correctly explains the law that governs this case. The governing Regulations make it plain that bad debts may only be claimed in the fiscal reporting period when they are deemed worthless. The Manual makes it plain that bad debts arising from services provided to patients dually eligible for Medicare and Medicaid benefits are deemed worthless at the time the state Medicaid agency issues a notice of remittance stating that Medicaid will not pay the deductible or coinsurance amounts. As such, the bad debts at issue in this case could not be claimed in the reporting period covered by the Terminating Cost Reports, because they had not yet been deemed worthless in that period.

Nothing in the Regulations or the Manual creates an exception when there has been a change of ownership and an automatic assignment of the provider agreement to the purchaser. In such situations, the provider agreement simply goes forward and the purchaser assumes the provider

7

number for the participating facility. The provider, that is, the facility itself without regard to its ownership structure, carries on in its relationship with the Secretary, uninterrupted. Bad debts must still be claimed in the period when they are deemed worthless, in this case on the first cost reports filed under the new owners. Accordingly, the Secretary's final decision was consistent with the law, and she acted well within her authority in disallowing Plaintiffs' claims for the bad debts in their Terminating Cost Report.

**A.     Bad debts may be claimed only in the fiscal reporting period in which they are deemed worthless.**

As the Administrator explains in the final decision, bad debts may only be claimed in the fiscal reporting period in which they are deemed worthless. Claims for bad debts are governed in the Regulations by 42 C.F.R. § 413.89. The Regulation sets forth four criteria that a bad debt must meet to be allowable:

> (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.
>
> (2) The provider must be able to establish that reasonable collection efforts were made.
>
> (3) The debt was actually uncollectible when claimed as worthless.
>
> (4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e). Bad debts cannot be claimed until all four of the criteria in the Regulation have been met. The Regulation clearly provides that "amounts uncollectible from specific beneficiaries are to be charged off as bad debts in the accounting period in which the accounts are deemed to be worthless." 42 C.F.R. § 413.89(f). See also Manual § 314.

**B.  The bad debts in this case were deemed worthless after the accounting periods covered by Plaintiffs' Terminating Cost Reports**

The bad debts claimed by Plaintiffs were deemed worthless when Plaintiffs received notices of remittance from the state Medicaid agencies, an event that occurred after the change of ownership.  When a Medicare beneficiary is also eligible for Medicaid benefits, the beneficiary is considered to be indigent and unable to pay the deductible or copayment.  See Manual § 312.  Because the beneficiary is unable to pay, the provider bills the Medicaid agency for unpaid deductibles or coinsurance payments as part of its "reasonable collection efforts."  If the Medicaid agency refuses to pay the bill, it sends a remittance notice to the provider.  This notice establishes that the debts are uncollectible and upon receipt of the notice the debts are considered worthless and become finally eligible for reimbursement from Medicare.[2]

In this case, it is undisputed that Plaintiffs received the notices of remittance for the bad debts at issue after the change of ownership but before filing the Terminating Cost Reports.  Under the unambiguous provisions of 42 C.F.R. § 413.89, the bad debts were not allowable during the period covered by the Terminating Cost Reports.  Medicare will not recognize bad debts as a

---

[2]Medicare compensates providers for bad debts to prevent "cross-subsidization."  The Medicare statute requires the Regulations to "take into account both direct and indirect costs of providers of services . . . in order that . . . the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered."  42 U.S.C. § 1395x(v)(1)(A).  Medicare compensates for unpaid deductibles and coinsurance payments so that non-Medicare patients will not have to subsidize those costs indirectly through higher fees.

Plaintiffs have argued that they will be forced to cross-subsidize the bad debts, since they were not able to claim them on their final cost report.  This argument is not persuasive.  As required by the statute, the Regulations take into account the direct and indirect costs to providers and have established a system to compensate providers for such costs by reimbursing for the bad debts of Medicare beneficiaries.  Plaintiffs and their purchasers simply failed to follow those procedures.

reimbursable expense until it is shown that reasonable collection efforts have been exhausted. Before the debts are finally shown to be uncollectible, they cannot be claimed. In this case, the bad debts were incurred as an expense item during a time period following Plaintiffs' final cost report, and they could only be claimed in that period.

### C. The change of ownership does not create an exception to the Regulations for claiming bad debt.

Nothing in the Regulations suggests that the policies and procedures for claiming bad debt are any different in the case of a change of ownership. The Regulations function to maintain a continuity of provider identity "without regard to the underlying ownership structure." Baptist Health v. Thompson, 458 F.3d 768, 778-79 (8th Cir. 2006). This continuity is ensured primarily by the automatic assignment provisions of 42 C.F.R. § 489.18(c). When a provider undergoes a change of ownership, the provider agreement is automatically assigned to the new owner. The assigned agreement is "subject to all applicable statues and regulations and to the terms and conditions under which it was originally issued." 42 C.F.R. § 489.13(d). In eyes of the Secretary, the provider remains the same; only the owner has changed.

The final cost reporting requirements in the Regulations are consistent with this continuity of provider identity. The regulation regarding cost reports distinguishes between a provider termination and a change of ownership:

> (1) Cost reports--Terminated providers and changes of ownership. A provider that voluntarily or involuntarily ceases to participate in the Medicare program **or** experiences a change of ownership must file a cost report for that period under the program beginning with the first day not included in a previous cost reporting period and ending with the effective date of termination of its provider agreement **or** change of ownership.

10

42 C.F.R. § 413.24(f)(1). As the language of this regulation implies, a change of ownership and a termination of a provider agreement are two distinct events.

In the case of a termination, there is no longer a provider to file further cost reports. The provider agreement is terminated and the provider number ceases to exist. Because the provider is no longer in operation, there will be no further reporting periods. The terminated provider is therefore eligible to claim all costs necessary to complete and close its participation in the Medicare program. Such costs may include bad debts that do not become finally allowable until after the termination.

With a simple change of ownership, the provider maintains its identity, keeping the same provider number, the same provider agreement, and the same relationship to the Secretary. The provider continues to file cost reports as before, and may claim bad debts that become allowable after the change of ownership. As explained above, as long as there is a persisting provider agreement and provider number, the Secretary considers the provider to be in continuous operation regardless of the ownership structure. As such, the "final cost report" in a change of ownership merely amounts to the filing of a cost report earlier than it would otherwise be required. The Regulations do not otherwise authorize this cost report to claim costs that were not incurred during the period covered by the report. Because the provider agreement continues, those costs must be reported on subsequent cost reports.

The continuity of the provider relationship after an automatic assignment is vividly illustrated in the case of United States v. Vernon Home Health, Inc., 21 F.3d 693 (5th Cir. 1994), a case much debated by the parties in this case. In Vernon, the government sued to recover overpayments made to a Medicare provider in the year prior to a change of ownership. The court

11

held that the purchaser was liable to repay the overpayment, even though the seller had received the overpayments.[3]

In finding that the purchaser could be liable, the court in Vernon explained that the automatic assignment provisions of the Medicare Regulations ensure that a provider maintains continuous identity through a change of ownership. The Medicare payment program continues to operate without interruption. The court explained the purpose of this continuity:

> By encompassing a system of interim payments on an estimated cost basis, subject to year-end accounting, the program ensures Medicare providers a steady flow of income sufficient to provide service. The assignee of a provider number is subject to this accounting procedure in order to provide continuous service.

21 F.3d at 696. When it accepted the automatic assignment and assumed the provider number from the seller, the purchaser stepped into the shoes of the provider and became liable for any overpayments that came due, even overpayments for services performed under the prior ownership. By the same logic, a purchaser also acquires the right to claim payment for bad debts that become allowable after the change of ownership, even bad debts related to services performed under the prior ownership.

The parties to the change of ownership may contract with each other to reimburse the seller for bad debts that must be claimed on subsequent cost reports or to reimburse the purchaser for overpayments that must be returned to the government. An example of such a contract can be seen in In re: RainTree Healthcare Corp., 431 F.3d 685 (9th Cir. 2005). In that case, RainTree sold its lease interest in a Medicare provider facility to Suncrest. RainTree later filed a bankruptcy petition. The owner of the bankruptcy estate sought to recover from Suncrest a payment made by the

---

[3]Plaintiffs note that the district court in the case below had found the purchaser and seller to be jointly and severally liable for the overpayment. See 21 F.3d at 694. The only issue before the Court of Appeals, however, was the liability of the purchaser.

Secretary after the change of ownership to resolve underpayments for services rendered prior to the change of ownership.

In deciding the case, the court looked not to the Medicare Regulations, but to the contract between the parties. The court reviewed the provisions of the Regulations related to the automatic assignment, at 42 C.F.R. § 489.18(c) and (d), and observed that the Regulations maintained a continuity of the provider agreement despite the change of ownership:

> The cumulative effect of these subsections is that Suncrest's lease of the nursing home facility and assumption of the Medicare provider agreement made Suncrest subject to the same statutory and regulatory conditions as RainTree had been. These conditions include provisions for adjustments for over- and underpayments.

431 F.3d at 688. According to these Regulations, the government had properly submitted payment for the prior services to Suncrest, the purchase and current holder of the provider agreement.

To determine RainTree's interest in the money, as holder of the provider agreement at the time the services were provided, the court interpreted the transfer agreement between RainTree and Suncrest according to state contract law. The court read the transfer agreement to provide that the seller, RainTree, retained the right to collect underpayments for services rendered prior to the change of ownership. The transfer agreement also provided that RainTree would remain liable for all debts arising from the operations of the facility prior to the transfer. Such provisions are not unusual in a contract for the sale of a business. Based on the provisions of the transfer agreement, the court held that Suncrest was obligated to pay RainTree the money it received from Medicare as compensation for underpayments related to services rendered while RainTree operated the provider.

In this case, there was no such contract. In any event, such a contract would only control the relationship between Plaintiffs and the purchasers. The Secretary would still be governed by the Regulations, which allow bad debts to be claimed only during the reporting period when they are

deemed worthless. Nothing in the Regulations permitted Plaintiffs to attempt to claim the bad debts in the prior cost reporting period.

### D. The Provider Reimbursement Manual is consistent with the Regulations

The Provider Reimbursement Manual does not create an exception to the cost reporting requirements in the event of a change of ownership. Plaintiffs' arguments in this case are largely based on an erroneous interpretation of Section 2176 of the Manual that makes it appear to be inconsistent with the clear terms of the Regulations. In fact, Section 2176 is consistent with the Regulations and does not allow a provider to claim bad debts in a cost report before they are finally incurred.

Section 2176 is cross-referenced in a section of the Manual dealing with final cost reports. Section 1503 of the Manual outlines a number of "items which must be taken into account in the final cost report of a provider." Among these items are "[c]ertain administrative costs incurred by the provider after the effective date of change of ownership." Manual § 1503(9). Section 1503(9) makes no reference to bad debts, but refers only to administrative costs. In reference to administrative costs, however, Section 1503(9) cross-references Section 2176, a provision entitled "Administrative Costs Incurred After Provider Terminates Participation in Program."

Section 2176 defines "administrative costs" in the context of a termination of a provider agreement. Section 2176 provides:

> When a provider terminates its participation in the program, either voluntarily or involuntarily, or a change of ownership occurs (see Health Insurance Regulations section 405.626), administrative costs associated with the preparation and settlement of cost reports with an intermediary and other third parties will be incurred after the effective date of termination. The direct administrative costs that are reasonable and related to the settlement of reimbursement for patient care rendered while the provider was participating in the program and bad debts resulting from coinsurance and deductibles billed to Medicare patients are allowable.

14

Manual § 2176. Administrative costs are defined in the first sentence of Section 2176 as costs "associated with the preparation and settlement of cost reports with an intermediary and other third parties."

The second sentence of Section 2176 offers further definition of allowable administrative costs, but is grammatically ambiguous. It can be read in two ways. In the first possible reading, the sentence has a simple core: "administrative costs ... are allowed." The subject, "administrative costs," is modified by a dependant clause: "that are reasonable and related to the settlement of reimbursement." The word "reimbursement" in turn is modified by a compound prepositional phrase: "for [1] patient care rendered while the provider was participating in the program and [2] bad debts resulting from coinsurance and deductibles billed to Medicare patients."

The first reading is far more reasonable than the second, and more consistent with the context of Section 2176. The heading of Section 2176 indicates that its purpose is to define the term "administrative costs." Section 1503(9) likewise refers to administrative costs. The plain meaning of the term suggests that it refers to costs incurred in administrative tasks such as preparing cost reports, copying receipts, filing forms, and the like. Such administrative costs may be incurred in seeking reimbursement for patient care or for bad debts.

In the second possible reading, the core of the sentence has a compound subject: "administrative costs ...and bad debts ... are allowed." The dependant clause modifies only the first subject, "administrative costs," and "bad debts" becomes a second item that is "allowed" in addition to administrative costs. This reading is not consistent with the context and express purpose of section 2176 and Section 1503(9). "Bad debts" themselves are not an administrative cost, but are substantive costs for which providers seek reimbursement, similar to patient care costs. It makes

15

little sense to group bad debts with administrative costs and far more sense to group them with patient care costs.

It makes much more sense to realize that Section 2176 allows a terminating provider to collect administrative costs that include reasonable costs "related to the settlement of reimbursement for ... bad debts." The Secretary therefore, made a reasonable interpretation of her own Manual in determining that the bad debts themselves could not be claimed as an administrative expense on Plaintiffs' final cost reports. This reasonable interpretation cannot be considered arbitrary and capricious or contrary to law.

Even if the second, noncontextual reading of Section 2176 is accepted, Section 2176 still does not authorize the claiming of bad debts out of time in a change of ownership where there is an automatic assignment. Section 1503 is the specific provision of the Manual that governs final cost reports in a change of ownership with an automatic assignment. Section 2176 is cross-referenced in Section 1503(9) for its definition of "administrative costs." If the second sentence is read with a compound subject, "bad debts" are a separate item allowable in addition to administrative costs, but allowable only in situations covered by Section 2176.

Section 2176 covers final cost reports filed after the termination of a provider agreement, as opposed to final cost reports filed after a change of ownership with an automatic assignment of the provider agreement. The title of the provision states that it applies in cases where the provider terminates participation in the Medicare program. The language of the provision confirms this distinction.

Plaintiffs' misinterpretation of Section 2176 is understandable, because the first sentence of the provision has a confusing reference to "a change of ownership." The context of this reference indicates, however, that the provision only relates to a change of ownership where the provider

16

agreement is terminated. Under the current Regulations, a provider may opt out of the automatic assignment and voluntarily terminate the provider agreement so that the purchaser could negotiate a new provider agreement with the Secretary. In such instances, Section 2176 would apply. Plaintiffs and their purchasers did not opt out of the automatic assignment in this case.

This confusion results from the Secretary's failure to amend the Manual after the Regulations were amended to create the automatic assignment procedure. Before 1980, a change of ownership entailed an automatic termination of the provider agreement, rather than an automatic assignment. Prior to May 5, 1980, the Regulations provided that "a transfer of ownership of a provider of services . . . render[s] such agreement invalid as between the Secretary and the transferee." See Humana, Inc. v. Heckler, 758 F.2d 696, 705 n. 64 (D.C.Cir. 1985) (citing 45 Fed. Reg. 22,935 (1980)). The old regulation was codified at 42 C.F.R. § 405.626(a). In 1980, the regulation was recodified at 42 C.F.R. § 489.18, and was changed to provide that the existing provider agreement would be automatically assigned in a change of ownership. Heckler, at n. 63, n. 64.

To define the term "change of ownership," Section 2176 still refers to the old regulation at 42 C.F.R. § 405.626. That regulation no longer exists. The Manual was drafted in 1976, and for some reason the Secretary has failed to amend it to account for the 1980 amendment to the Regulations.

The outdated reference to 42 C.F.R. § 405.626, though confusing, confirms what is otherwise clear from the title and terms of Section 2176: the provisions of Section 2176 apply only in terminations of provider agreements. In that context, Section 2176 is perfectly consistent with the Regulations even if it is read to allow bad debts in addition to administrative costs. In the event of a termination, bad debts must be claimed on the final cost report because there will be no further cost reports. The affairs of the provider are settled once and for all. When there is an automatic

17

assignment of the provider agreement, to the contrary, the business of the provider will continue, and there will be further cost reports. In such cases, the provider follows Section 1503 of the Manual, which allows only "administrative costs" and says nothing about bad debts. Because the provider will continue to operate under the same agreement and with the same provider number, the provider may continue to claim the bad debts in the period when they become "allowable" according to 42 C.F.R. § 413.89.

> **E.      Any inconsistency between the Manual and the Regulations must be resolved in favor of the Regulations.**

In any case, Plaintiffs' proposed reading of Section 2176 is inconsistent with the clear provisions of the Regulations. To the extent that the Regulations and the Manual are inconsistent, the Regulations must control. In its foreword, the Manual explains that the Manual seeks to reflect accurately the provisions of the law and the Regulations, but that "it does not have the effect of regulations." The Manual is "an extensive set of interpretative guidelines and policies published to assist intermediaries and providers." Horras v. Leavitt, 495 F.3d 894, 900 (8th Cir. 2007). Such interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 99 (1995).[4] The Manual must therefore be read to be consistent with the Regulations whenever possible. As applied in this case, the terms of the Manual are consistent with the Regulations when read in the proper context, and the Secretary has applied them in such a manner. The interpretation proposed by the Plaintiffs, though perhaps understandable due to the confusing use of the term "change of ownership" in

---

[4]Interpretive rules such as those set forth in the Manual do not require notice and comment. See Shalala, 514 U.S. at 99. Plaintiffs' arguments concerning "retroactive rulemaking" are therefore without merit.

Section 2176, is not consistent with the Regulations. Any inconsistency between the Manual and the Regulations must be resolved in favor of the Regulations.

## IV. CONCLUSION

Plaintiffs have failed to show that the final decision of the Secretary was arbitrary and capricious or an abuse of discretion. The Secretary's decision was based on an interpretation of unambiguous Regulations governing the time for reporting bad debts. As applied to the undisputed facts in this case, those Regulations provided that the bad debts were not finally incurred until after the change of ownership, when they were finally deemed worthless. As such, they were not subject to inclusion in the Terminating Cost Reports filed by Plaintiffs, but should have been included on the subsequent cost reports filed by the purchasers. Any apparent ambiguity in the Providers Reimbursement Manual cannot change the provisions of the Regulations. Because there are no genuine issues of material fact and because the Secretary is entitled to judgment as a matter of law, Defendant's Motion for Summary Judgment is hereby granted, and the final decision of the Secretary is affirmed.

It is SO ORDERED this 14th day of September, 2010.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

chw